This video was recorded on September 11, 2020 at the UCB Pharmaceuticals v. UCB Pharma GmbH in San Francisco, California.  Next case is Amerigen Pharmaceuticals v. UCB Pharma GmbH, 2017, 2596. Mr. Hale. May it please the Court. I'd like to start off our presentation to talk about the issue of the standing and address that. First, I think it's good to point out that there seems to be this erroneous assumption that a P3 patent certification on a product is permanent, that you can't change it. And that's just not the case. If this Court reverses the Board and finds that the patent, the 650 patent, is invalid, then the FDA would be notified and would eventually have to change the listing of that patent and remove it from the Orange Book. At that point, Amerigen could change its P3 patent certification to a different certification, and the 650 patent would not prevent Amerigen from launching this end-of-product. If you could just describe that a little bit more. How automatic is it that under a circumstance like that, when a patent is delisted from the Orange Book, that someone like you that has a Paragraph 3 certification could just walk in and very quickly, immediately, without any question from the FDA, get a modification of your certification? Well, it's not that easy, so I don't want to convey that. Okay. What other hurdles, what other issues would the FDA want to consider before they did anything to your Paragraph 3 certification? By the regulations, you would need to show that the Court has invalidated this patent, and then the FDA would take that Court decision and look to see if the patent provides any and-a-file or 180-day exclusivity. Once that 180-day exclusivity has passed, then the FDA would be permitted to delist that patent from the Orange Book. So it's not as simple as... Well, so Amerigen has an and-a with a tentative approval. A tentative approval means the FDA has reviewed the and-a, and but for the patents, it's technically able to be approved, and FDA would approve it. So the P3 is the barrier to Amerigen getting approval of this and-a. That's the only barrier? Is that the only barrier? Yes, yes. Well, there are four patents expiring in May of 2019 to which we have P3 certifications. Those would have to expire. We're not challenging those, but once those expire on May 11th, if you reverse the Board's decision, we would be able to launch. We have patent challenges to later expiring patents, 2028, I don't remember the dates, P4 certifications that have been maintained and continue on. So yes, the May 11th expiring patents and this P3. But on the merits, obviousness, what is there in the prior art to motivate someone to take a pro-drug, which is usually not active, to make a pro-drug at a particular position? Okay. So, tolteridine is metabolized to 5-HMT. 5-HMT is the active metabolite of tolteridine. It is what provides the majority of the activity. You have prior art references like Brine that from 1998 to describe a difference in lipophilicity between tolteridine and 5-HMT. Tolteridine was a billion plus a year drug. It worked well. So when you have a product that's the metabolite of it, but it has a tenfold less lipophilicity, I think one of skill in the art would want to try to be closer to lipophilicity of this successful drug that worked well. But what tells you, one skill in the art, to make a pro-drug at that hydroxy position and make an ester? Versus making it a diester, for example, are you asking? Yes, or making any other change. You get a whole complicated molecule there. So there's really only three sites that you can modify, the amine and the two different hydroxy groups. One of the hydroxyl groups is the site, the 5, that has the activity. It's what is, when tolteridine is metabolized, it's where the changes occur. So you want to keep the 5 as the hydroxyl. The 2, there's a number of reasons that we presented as to why you would want to modify the 2. You want to avoid transesterification, so this is a site because of steric hindrance. You don't want to overcomplicate the molecules. So if you make a diester, you're hoping that the esterases will cleave the esters from both the 2 and the 5 sites. If you just do 1, it's more likely to occur. Why would you just do 1 also? So you're talking about a difference in lipophilicity, a tenfold difference. So you, what I would call tweak, you're wanting to tweak the molecule. Bungard, which was, we've cited as a treatise on esters, talks about, well, it's a treatise on prodrugs, but it talks about esters, how they've been used, how simple they are, and how you can modify the lipophilicity easily with esters. So then the question you might ask would be, why would you go to a short-chain ester versus a long-chain ester? Again, you're trying to tweak the lipophilicity. You're not trying to change it wholesale. So you would want to do a short-chain ester and see if you get close to the lipophilicity. All of these are possibilities, and that's what UCB did. But it's not clear to me why it's necessarily obvious that one would do this. And if you look at, I think it's a claim that's specific to an isobutyl ester. And what tells you to make claim 5? Claim 5 is specific to two salts in an isobutyl ester. So you would be selecting from a narrow range of short-chain... In other words, you know that's good, and you're looking backwards. You're looking backwards and saying, well, sure, doing these things results in a good product. But looking forward from 5-HMT, it isn't necessarily clear to go to these kinds of products. I disagree with that. So you're wanting to tweak the lipophilicity to be closer to tolteridine. So you would want to start with small incremental changes. Dr. Patterson talks about, he applied the Lipinski rule of 5 and explained why, for example, you wouldn't do a diester because it would make it too lipophilic. The same rationale would apply for adding a much longer chain. It would make it too lipophilic. Really, when you have tolteridine that's successful, you would want to aim to have a lipophilicity close to tolteridine. So you don't want to use an ester or any other prodrug that would radically change it too much. So I don't know if that answers sufficiently the 2, the 5. Okay. One other reason that you would want to modify 5-HMT does have to do with the existence of a patent that covers 5-HMT, the Johansson patent. This was raised in a footnote in the petition that referenced a declaration of Dr. Patterson, who's an expert in drug discovery and development, making commercial molecules. He explained that if there's a patent that you want to change that because you're not going to get a patent on it, so why invest the money in it? And you don't want to infringe that patent so that it was a foreign patent and there'd be a U.S. counterpart. That motivation was dismissed. Is that an automatic motivation? As a matter of law, any time a compound is patented, it's an automatic motivation to modify that compound? I mean, there's other considerations that would take place too, right? Maybe you could license it. Maybe it's really expensive and unpredictable and time-consuming to do all this kind of research to make a series of modifications or to explore whether to modify a compound that's been patented. I'm just wondering if that's good enough of a motivation to find a compound that is under a patent and then decide, okay, I'm going to set up a big lab and engage in a series of experiments to modify that compound. Well, I think making an EstroPro drug is quite a bit less than setting up the big lab and doing all the work. EstroDrugs are simple? An EstroPro drug is not that hard. There was expert testimony by patent owners that it was explained that it was not that hard. Is there contrary expert testimony explaining that it is hard? And the same experts also did say it was hard. It all depends upon the pro-drug you want to use, but an EstroPro drug should be a simple process. I believe the testimony is something the degree in chemistry should be able to do this. But back to your question about is a patent an automatic motivation, I don't know if that's an automatic motivation in maybe in all fields, but in drug discovery where you're going to spend a lot of money to develop a new molecule, you want to make sure you're not infringing and that you can get a patent. So many litigations come to this court for andophilins having to do with the patents on the drug. There's so much money involved in it that, and Dr. Patterson testified to this in his declaration, that this is a consideration that you would keep, that you would take because you need to make sure that this is a commercially viable molecule. If there's nothing further, we'll save you a rebuttal time. Well, I'd like to quickly jump on to what we view as some of the errors that the board made in this case. They seem to require experimental evidence from the Amerigen, whereas they didn't require that from the patent owner, UCB. They also required Amerigen to find modifications in analogous art, like compounds with the same mechanism of action, compounds with the same chemical class, compounds with the same treatment, whereas they didn't require that for UCB. For example, looking for prodrugs. They asked the question, well, this hasn't been shown to occur, prodrugs for anti-muscarinics. Amerigen, you haven't shown that. Amerigen, you haven't shown prodrugs of diphenylpropylamines. Amerigen, you haven't shown prodrugs of overactive bladder. But this is just a chemical reaction in a lab. Then when Amerigen did provide evidence in analogous art, such as for the salts, that was dismissed, and instead the board relied on a conclusory statement. For example, salts of fesoteridine. Tolteridine is the tartrate salt. Oxybutyn is the chloride is a diphenylpropylamine and is used for overactive bladder. So why should we, why should the board disregard that evidence in the same category of molecules, mechanism of action, and method of treatment, but yet ignore it in other? You're into time. You wanted to save the rebuttal. I will save that. Thank you. Is it Mr. Olke? That's correct, Your Honor. Jeff Olke on behalf of the appellee UCB Pharma GmbH. I'll start with addressing the merits, and I can get to the standing issue at the end if Your Honor's wish. The 650 patent is a patent that has been tried on the same obviousness theory three times. That obviousness theory has led to the same result three times, and that is that the claim subject matter of the 650 patent would not have been obvious to a person of ordinary skill in the art. The standard for reviewing the board's decision is substantial evidence. And the essence of Amerigen's dispute in their appeal brief is that the board weighed the evidence and sided with the patentee's evidence over Amerigen's evidence and Amerigen's expert's evidence. But substantial evidence, it's met multiple times in this decision by the board. At least six different critical findings of fact are made by the board weighing the evidence from the petitioner, from the patentee, from the experts, from the evidence that's submitted as part of that record. And in some instances they did find the petitioner's evidence sufficient. Is it accepted that 5-HMT is a lead compound? We dispute that, Your Honor. We don't believe 5-HMT should be a lead compound. The board did find that it was a lead compound, but our view is that 5-HMT has never been used as a drug as of the prior art. So looking at the prior art, all the evidence relating to 5-HMT is as a metabolite. It had never been orally administered. And there's a very big difference between how something works as a metabolite and how it works as an orally administered drug. All of that was unknown, whether or not 5-HMT could be administered. But that does go to the first finding of fact, which I think is critical and is foundational to Amerigen's argument. And that is there would have been a motivation to modify 5-HMT. And their argument is, if you look in the petition, the argument is, well, there's a bioavailability problem with 5-HMT. What's that bioavailability problem? Basically that it wouldn't be absorbed into the bloodstream if it's orally administered. They back away from that in their appellate argument. If you notice in their appeal brief, they start to switch to lipophilicity and say, well, we mentioned bioavailability, but we're really talking about lipophilicity. But bioavailability, why did they back away from it? Because the board properly found this record shows 5-HMT probably doesn't have a bioavailability problem. And Dr. Rausch, who is the patentee's expert, put in evidence of many drugs that have lipophilicity below and above 5-HMT that are perfectly well absorbed when they're orally administered. So it actually fits in a range of drugs that have a lipophilicity higher and lower, all suggestive that bioavailability wouldn't be a problem, wouldn't cause a person of ordinary skill to modify 5-HMT. But assuming 5-HMT is a lead compound, your opponent says, well, making a pro drug and covering up the 2-hydroxy group, simple thing to do. That's their position, Your Honor. It's very easy to say that after the fact. This is another one of the board's findings. They looked at this issue of the 2... That's what it is. It's looking at the solution after the fact. It's hindsight. How would you know to only focus on the 2 position and not look at the 5 position? There is evidence in dispute from both parties on this point. Dr. Rausch said there's plenty of evidence you would try it, both the 2 position and the 5 position. In fact, the prior art that is put forward by Amerigen, their main art on pro drugs, the Bungard reference and the Bungard PCT reference, both talk about diesters. What is a diester? A diester in our case is you make a change at the 2 position and the 5 position. And in fact, two of the three preferred embodiments in the Bungard PCT, they're diesters. So the record that has been put forward by Amerigen actually suggests do a C5 and what Dr. Rausch found was he did a calculation. He said you look at those 2 positions, even if you do simple esters, and you wouldn't because Bungard talks about many other different possibilities. If you just do simple esters at those 2 positions, you have 86 at one, 86 at the other, 86 when you do a diester. And if you do a mixed diester, do one type of ester at one position and a different one at the other. All the different alkyl groups. That's right. C2 to C6. You get it to 86. Are all these claims seated together? That's right. In fact, that's right. They argued them really based on fessatarity in itself. Which is basically claim 5. That's right. The isobutyl substituent. One specific substituent. And that specific chemical modification is nowhere in this record in the prior art. They don't even try to argue that isobutyl is shown anywhere in this prior art. And again, the board found that. And they decided with the evidence submitted, substantial evidence submitted by the patentee's expert. And that was, there is nowhere in this record pointing to the specific molecular modification. And that specific molecular modification is the isobutyl group. They don't even have a reference that teaches that and shows that. They just say, well, the Bungard Treatise, which is a general treatise on prodrugs, talks about a number of different prodrugs. And one of them is alkyl esters. But there's many other possibilities. There's carbamates, carbonates, many others they could have tried. All of which are mentioned and talked about and described in the Bungard reference, their own reference. In addition to that, the other types of prodrugs that were put forward by Amerigen, the Bungard PCT is the other reference that they disclosed. But that's morphine. It's a transdermal morphine. It's not even orally administered. And certainly morphine is not a type of compound you would be looking to if you're making a prodrug of a diphenylpropylamine or a prodrug of an OAB drug, an incontinence drug like this. What about standing? And the idea that they agreed not to market. Their argument is that we could reverse, and so the patent would not be blocking them. Your Honor, if I can just talk about the unique set of facts that got us to this appeal to address your question. And that is, in 2013 there were a series of first filers that challenged the patents on this drug. Amerigen was one of them. So they filed a paragraph four certification against five patents, including this patent, the 650 patent. We went to trial against them in the District of Delaware. And on all patents, all claims found valid and infringed. And the court there then put in an injunction against those first filers. And what did that injunction do? It says they cannot have approval of their ANDA until these patents expire, including the 650 patent. It expires in 2022. And they had the opportunity at that point with their paragraph four certification, which is a statement to the FDA, we're challenging this patent, they had the opportunity at that point to appeal that decision. They chose not to. Why? Because they didn't want to have attorney's fees against them. And so in exchange for our not pursuing attorney's fees in the district court, they agreed not to pursue an appeal. They gave it up. And when that happens, they automatically convert to a paragraph three certification. What is a paragraph three certification? That's telling the FDA, we're not seeking approval until this patent expires. So as far as the FDA is concerned, Amerigen's situation is... But if we reverse and invalidate it, that's the equivalent of it expiring, isn't it? Well, it's actually more complicated than that, Your Honor. It goes beyond that. As Mr. Harris said, there's a number of issues that go to whether it would be delisted at that point. But this is only standing here, enabling them to argue the appeal. But standing requires an injury in fact. And that injury in fact, they seem to change what is that in this case. They say, well, maybe it's the fact that the patent is valid. That's one statement they make in their briefing. If it's not the fact that the time when the patent might be delisted, if this case has the impact of causing the patent to be delisted off the orange book, then isn't it correct that there could be a difference in time when they would be free in order to go on the market? If there comes a time eventually in which the patent is delisted, it may eventually lead to a time in which they could get approval. But there's a lot of possibilities in there before that could take place. Okay, why don't you walk through that possibility? Because I'm not understanding it. If this court were to invalidate the 650 patent, and I'm happy to talk about all the reasons why I don't think that should be the case. We've done that. Just assuming. Understood. Just trying to see if there's... Hypothetically, if the 650 patent were invalidated, the FDA would have to make a decision on whether or not to delist it. And they would have to do that in part based on whether anyone has first filer status on the basis of that patent. So there were a number of first filers, and some of them settled. So they were not enjoined by the district court. So if one of those first filers met all their other requirements, it's possible that they will have first filer exclusivity. So there would be 180 days... That's correct. ...added on, okay. That's correct. And then what? It would be 180 days from when they can first mark it. That's correct. After that point in time, then there may be a time in which it would be delisted. Is there anything that would stop the FDA from delisting at that point, after the exhaustion of the 180-day exclusivity? Well, subject to our not appealing this decision further, I can't think of anything that would go beyond that, Your Honor. But these are a lot of possibilities that are all self-inflicted because they converted to a paragraph 3. They chose that. If you look at the case law on standing, it has to be an injury, in fact, traceable to the conduct of the party that the case is against. In our case, UCB. But it isn't our activity, our conduct that has led to this stage. The conduct that led to this stage is their decision to no longer challenge the patent. There is no case in which a paragraph 3 filer, which is a statement to the FDA, we will not challenge this patent. We will wait until this patent expires. That's what paragraph 3 is. It's not a statement that, please go ahead and still invalidate the patent. It is, we're going to honor this patent and wait until it expires. They cannot infringe this patent. It's not possible. There is an injunction in place by the District of Delaware, which they did not contest, which says you cannot approve this product until the patent expires. If the patent were to be invalidated further than 2022 and the 180-day exclusivity expires, let's say this all happens a year from today, and then the patent gets delisted, I assume the other side could go to the District of Delaware and ask for the injunction to be modified? They say that in their papers, Your Honor. But there's no case where this has actually occurred. So I presume that's what they would try. But as I said, there is no case where a paragraph 3 filer, who is honoring a patent, that's what they're telling the FDA, has gone into an Article 3 court and said, find the patent invalid. Or delist the patent. Sorry, Your Honor. Do I understand correctly that the difference in time for when you have, I think, four or five patents, and the patented issue here has an expiration date that's about three years later than the expiration date of the other patents that are in that paragraph 3 certification? That's right. 2019 are the four other patents. They expire in 2019. The 650 patent expires in 2022. So it's a three-year difference. So even when they filed their appeal, 2019 was over a year and a half out. So that's another reason why there's an immediacy issue, and we briefed that with respect to the Janssen case. Of course, we're farther along at this point. But they needed to have standing when they filed their appeal. And there's a question of whether that's the case. But I really want to emphasize this point, because I'm not sure from the questions, that I want to make sure it's clear from the briefing. There has never been a case in which a paragraph 3 filer has been able to come to an Article 3 court and seek invalidation. Can't do it. They can't file a declaratory judgment in any district court. Wouldn't be possible under the Hatch-Waxman scheme. Hatch-Waxman says you have to be a paragraph 4 filer to have that opportunity. If you have a paragraph 3, you have to wait. That's the way the Hatch-Waxman scheme is set up. So if we agree with you, the question of the obviousness is moot. That's correct, Your Honor. Although, I certainly have all the reasons that I gave why these claims would not be caused. But if they don't have standing to appeal, then we don't have that issue. That's correct, Your Honor. And that's our position. Any other questions, Your Honor? No. Thank you very much, counsel. Mr. Hare has got a minute and 45 seconds. I've got a couple quick points I'd like to make, really, to focus on the standing. Talk a little bit about the statute that governs this. So Mr. Opie mentions Janssen case. Janssen was the pre-MMA law which modified the Food, Drug, and Cosmetic Act to include forfeiture provisions. So this comes to, if you invalidate this patent, the question was, when would the patent get delisted? You invalidate the patent, and people, any generic anders with a P4 to the 650 don't launch within a certain amount of time they forfeit their exclusivity. Or, if they do launch in a certain amount of time, 180 days, that exclusivity expires. At that point, either through the forfeiture, if everyone who has a P4 and a 650 patent forfeits, the patent would be able to be delisted. Or, once the 180 days has expired from the first person to launch, then it would expire. I'd also like to point out that since filing the briefs, there's a couple decisions from this Court having to do with standing that are relevant to this, that are closer to the... Shouldn't you have sent them to us before today? I expect you're correct on that. Let me ask you a question. The other side is talking about your settlement of that earlier litigation with them, where, in their view, you voluntarily, willingly moved over to a Paragraph 3 certification. And so because of your voluntary act of doing that, you are essentially estopped from claiming any kind of controversy as to the patent, and so therefore shouldn't be considered to have standing here. Could you speak to that? You're on your own volition moving over to Paragraph 3, and how we should think about that with respect to standing here. I'd raise two points. One, sometimes companies make a business decision that it's better to settle than to go forward. Plus, we have different standards for an IPR versus a district court. So that would be an additional reason that we might want to join into an IPR. So Amerigen joined into a petition once it was instituted. When you say join into an IPR, you're saying before the Patent Office, right? Correct, correct. Or are you talking about the appeal before this Court? Because obviously anybody can, and there's no limitations in the PTO for filing. I realize you had limitations for filing, but you were able to join. But yes, hedge funds can file. But it's different for entering into these proceedings with the agency as opposed to an appeal to an Article 3 Court. You agree with that, right? Yes, there are differences. So is it your point that the standing requirements for district court declaratory judgment action is different than the standing requirements for an appeal here? No. Make sure I'm answering your question correctly. So an appeal of a... where there's a provision that permits an appeal from an agency action like an IPR here, there's a relaxation of the redressability and the traceability or immediacy of the challenge action. But you still have to prove the injury in fact. So that's what I've been focused on, is the injury in fact that we have here, where there is a listing of the patent in the Orange Book that prevents us from launching. We have tentative approval. We've taken all the actions that case law indicates should show that we have standing, that we have an injury in fact. I'm not sure if I answered your question. No, you're answering. One final comment. Yes, sir. If you have one final comment. Oh, I'm sorry, I thought you had a final comment. No, I... Thank you. We'll take the case under advisement. Thank you.